IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 27, 2021, at Knoxville

**MARIO NORFLEET v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 11-06148     Chris Craft, Judge

_____

**No. W2020-00694-CCA-R3-PC**

_____

The petitioner, Mario Norfleet, appeals the denial of his post-conviction petition arguing the post-conviction court erred in finding he received the effective assistance of counsel at trial. Following our review, we affirm the post-conviction court's denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Ernest J. Beasley, Memphis, Tennessee, for the appellant, Mario Norfleet.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Byron Winsett, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

***Factual and Procedural History***

**I.     Trial Proceedings**

The petitioner, Mario Norfleet, was convicted by a Shelby County Criminal Court jury of theft of property valued at more than $60,000, for which he received a sentence of thirty years in confinement as a career offender. On direct appeal, this Court set forth the relevant facts as follows:[1]

---

[1] Due to the length of the trial court testimony, we have only included those facts relevant to the issues raised on post-conviction and on appeal.

This case arises from the theft of furniture from a warehouse where items were stored for Fox Lane Furniture in Memphis, Tennessee. A Shelby County grand jury indicted [the petitioner and Terence Mitchell] for theft of property valued at more than $60,000. At the trial for these charges, the parties presented the following evidence: Robert Landshof, the sole proprietor of Fox Lane Furniture, testified that he started his furniture business in Memphis, Tennessee, in 1970. He explained that he operated a 15,000 square foot showroom located on Winchester Road and a warehouse located on Barton Drive. Mr. Landshof had owned the three-story warehouse since 1997 and said he stored "[m]illions of dollars' worth" of furniture inventory in the warehouse.

Mr. Landshof testified that, during the time period of September 2010 to January 2011, he experienced "considerable loss" to his inventory due to multiple "break-ins" of his warehouse. About these break-ins, Mr. Landshof stated:

> The first incident was noticed in the first part of September of 2010. The front door lock to the warehouse has a steel cover plate that sort of covers the area where the deadbolt goes into the frame. And that steel cover plate was chiseled off allowing someone to pry the deadbolt back and gain access to the building.
>
> . . . .
>
> We called the police immediately . . . and had them come out and you know, the documentation was started at that date, the problem was, we repaired that lock, we reinforced that lock, and over the next five months, every door—there's like six different doors to the building, every single door was smashed, broken, chopped, whatever manner, I couldn't stop it.

Mr. Landshof stated that he placed additional locks to the doors and added cables and chains, both of which were "easily cut." "Out of desperation" he attempted to cement a rear door that went into the basement of the building but ultimately just "reinforced" the doors. Mr. Landshof sat in his pickup truck some nights and watched the warehouse in an attempt to figure out how "massive amounts of furniture" was being removed from his warehouse.

Mr. Landshof testified that, although it was not initially apparent, he finally determined that the intruders had removed a sheet of metal covering the rear windows on the building and "chopped" a hole through one of the windows, providing a small opening into the basement. After entry, the intruders would replace the sheet metal to obscure detection. Once someone was inside the building, the bar on an exit door could be pushed to get out of the building. Mr. Landshof testified that the total value of the furniture taken during the numerous break-ins was "in excess of seven hundred and fifty thousand dollars." He described the warehouse as "in a shambles" with items ripped out of the boxes, items smashed, and items broken. He recalled that he found a section of the warehouse that "might hold thirty beds" with all the boxes intact but empty.

Mr. Landshof testified that, in mid-January 2011, at the request of a Memphis Police detective, he drove to a residence on Whittaker Drive in Memphis, Tennessee. Upon entering the residence, Mr. Landshof found that "it was very obvious" that it was his inventory in the residence. Mr. Landshof recalled that the residents of the home were present and that he did not know any of them nor had he given any of them permission to take the furniture to the residence on Whittaker Drive. Mr. Landshof said that the two-story house and garage were full of the stolen furniture and there were stolen items in the backyard. He said that he found it "most disconcerting" to see the furniture outside because the winter weather and elements were destroying the furniture. Mr. Landshof identified photographs taken of the stolen furniture at the Whittaker Drive residence. About his identification of the items found at the Whittaker Drive residence, Mr. Landshof explained that some of the furniture he had imported from China and were items "no one else would have had." He further explained that the items that were still boxed had labels addressed to "Robert Landshof." Mr. Landshof stated that the condition in which he found the furniture was such that he could no longer sell it.

Mr. Landshof testified that he saw a truck with a trailer sitting in front of the Whittaker Drive residence. The bed of the pickup truck was filled with empty furniture cartons and packing material. He also observed empty boxes on the trailer. Mr. Landshof identified the list he made while at the Whittaker Drive residence of each of the furniture items recovered at the residence. On the inventory pages, he listed the market value of each of the items before the items were stolen and damaged, with a total value of $76,913 for the items recovered from the Whittaker Drive residence. As to the amount of the furniture found at the Whittaker Drive residence, Mr. Landshof estimated

that the items would have fit into a "twenty-six foot bob truck." He said that, at the time, he had only a twenty-foot trailer, so it took multiple trips over the course of five to six hours for Mr. Landshof to load all of the items at the Whittaker Drive residence and return the items to his warehouse. Mr. Landshof stated that he had been unable to sell any of the recovered furniture due to damage.

Mr. Landshof testified that, approximately ten days later, he learned that more furniture had been located in a storage unit, Extra Space Storage, near Elvis Presley Boulevard in Memphis, Tennessee. Mr. Landshof said that it was "instantly obvious" to him that the items in the storage unit belonged to him. He once again made an itemized list of the furniture recovered from multiple storage units and estimated the total value of the items at $89,944. Mr. Landshof explained that he calculated the value of the items in the storage units including the full value of damaged items and the value of items that were missing from boxes that remained in the storage units. The value of the items recovered from the storage units was $76,608 with a total amount of $89,944 for both items recovered and items considered as missing furniture due to the remaining boxes. Mr. Landshof identified photographs of furniture in the storage units, noting that the items were thrown into the units and were broken, dragged, and missing parts. Mr. Landshof confirmed that he did not find one piece of furniture in any of the units that did not belong to him.

Mr. Landshof testified that there was a third recovery of his furniture approximately two months later at a flea market building on Brooks Road. He stated that this was a "smaller recovery" with all of the furniture unboxed and set up in a ten by twenty booth. Mr. Landshof stated that, based upon the three recoveries, approximately twenty percent of the total items stolen from the warehouse were found.

On cross-examination, Mr. Landshof testified he did not know either of the defendants. Mr. Landshof confirmed that his alarm system was broken during the time of the break-ins and that he had not installed video surveillance in the warehouse. Mr. Landshof estimated that it would have taken approximately fifty loads with a pickup truck and trailer to remove all of the items that had been stolen from the warehouse.

Mr. Landshof confirmed that he was a sole proprietor and that there was no corporate entity of Fox Lane Furniture. He said that he had operated under the name Fox Lane Furniture and Real Furniture Gallery.

Lakesha Mitchell, Defendant Mitchell's sister, testified that [the petitioner] had been her brother's friend since childhood. Ms. Mitchell confirmed that her brother lived at the Whittaker Drive residence in January 2011 with a roommate, "Damien," and a cousin, "Darryl." She estimated that he lived in this residence for approximately three years. She said that Lavell Mitchell, her father, did not live at the Whittaker Drive residence but was "over there." She explained that her father "was like back and forth" between her "aunty['s]" residence and the Whittaker Drive residence. Ms. Mitchell agreed that [the petitioner] was also at the Whittaker Drive residence "quite often" when she would stop by the residence.

Ms. Mitchell testified that she frequently went to the Whittaker Drive residence to see her nephew. During these visits she saw an "[u]nusual amount[ ] of furniture." She said there was furniture in the house and in the front yard, but she denied seeing any boxed furniture. Ms. Mitchell recalled that Defendant Mitchell was unemployed at this time but explained that he "cut grass" and hauled away stoves and refrigerators from residences for money. She stated that Defendant Mitchell also bought items such as clothing and shoes to resell. Ms. Mitchell agreed that Defendant Mitchell had also bought furniture for resale.

. . . .

Tameka Odom, Defendant Mitchell's sister, testified that in January 2011, Defendant Mitchell, "Darryl," Damien Gates, and her father Lavell Mitchell lived at the Whittaker Drive residence. Ms. Odom explained that Lavell Mitchell was her stepfather but the biological father of her sister, Ms. Mitchell, and her brother, Defendant Mitchell. She said that "Darryl" was her cousin and Damien Gates was a friend of the family. Ms. Odom stated that, in January 2011, Defendant Mitchell had been living at the Whittaker Drive residence for "some years." She said that she had often seen [the petitioner], a family friend, at the Whittaker Drive residence during the month of January in 2011. She described the Whittaker Drive residence as a place where "a lot" of people "hung out."

Ms. Odom testified that she was doing laundry at the Whittaker Drive residence on January 13, 2011. She recalled seeing four or five pieces of boxed furniture in the residence, but she did not see any boxes outside of the residence. She denied seeing boxes stacked in the kitchen of the residence. Ms. Odom agreed that she provided the police with a signed statement of

what she had observed in the Whittaker Street residence on January 13, 2011. The police statement reflected that Ms. Odom had indicated that she saw "boxes stacked in the kitchen" and "sofas in the backyard." She agreed that the descriptions she provided in the statement were correct even though inconsistent with her trial testimony. She explained that it had been "so long" since this event that she could not recall all the details.

Ms. Odom testified that Defendant Mitchell was unemployed in January 2011 but "help[ed] people move" furniture and offered lawn services for income. Ms. Odom again agreed that if her statement to police indicated that Defendant Mitchell's lawn service had been unsuccessful, then that would be correct. Ms. Odom confirmed that Defendant Mitchell owned a trailer he used to help people move. Ms. Odom agreed that Defendant Mitchell was also engaged in the sale of merchandise. She said that he sold "[w]hatever he c[a]me across." She guessed that he accessed the items for sale by purchasing the items wholesale but that she "ha[d] no idea" where Defendant Mitchell acquired the items he sold.

. . . .

Sherocka Jones testified that she and Defendant Mitchell had two children together and that, for approximately nine months from the end of 2009 until August 2010, she lived at the Whittaker Drive residence with Defendant Mitchell. Ms. Jones stated that during this time Defendant Mitchell's father, Lavell Mitchell, lived at the residence "off and on." Ms. Jones testified that while she lived at the Whittaker Drive residence, Defendant Mitchell was unemployed but would purchase items and resell them for income. Defendant Mitchell purchased items such as purses and clothing from a flea market on Third Street. Upon occasion, Ms. Jones had accompanied Defendant Mitchell to the flea market and observed him purchasing items for resale. She said that she had never seen him buy any items other than purses and clothing.

Ms. Jones testified that, after moving out of the Whittaker Drive residence, she returned to the residence on occasion to have Defendant Mitchell watch their children while she worked. Ms. Jones stated that she did not go inside the house on these occasions but that Defendant Mitchell met her at her car to take the children inside. Ms. Jones stated that a family member contacted her at work on the evening of January 12, 2011, and advised her that she should go and get her children who were at the Whittaker Drive residence. When Ms. Jones arrived at the residence, she observed

police officers and "a lot of trucks." Upon entry into the house, she was questioned and then arrested because her name was still listed on the utility bill. Ms. Jones explained that she had not "transfer[red]" the utilities to another location because she was staying with a friend at the time. Ms. Jones testified that during this incident she did not go beyond the front room of the residence but that she observed that there was "more furniture than was necessary to furnish the house."

Deven Shives testified that he was arrested and charged in this case along with Defendant Mitchell and [the petitioner]. Mr. Shives explained that he was not arrested at the Whittaker Drive residence at the time of the execution of the search warrant but that he was driving in the "Whitehaven area" when he was pulled over and arrested. Mr. Shives stated that he owned a "bob truck" that he bought to transport furniture purchased at auctions. After buying the truck in 2009, he also used it to help move people. Mr. Shives recalled that he rented his truck to Lavell Mitchell, Defendant Mitchell's father, in January 2011. Lavell Mitchell told Mr. Shives that he needed to rent the truck for one day to help his girlfriend with a move. When Lavell Mitchell did not return the truck after twenty-four hours, Mr. Shives drove to Defendant Mitchell's residence where he observed the truck sitting out front.

Mr. Shives testified that Lavell Mitchell met him outside and explained that there was still some furniture in the back of the truck. When Lavell Mitchell "raised the back of the truck up," Mr. Shives observed "a couple of boxes of furniture . . . like maybe two nightstands and two dressers." Mr. Shives agreed to allow Lavell Mitchell to transport the items to storage and then return the truck. The two men drove to a nearby storage facility and arranged for a storage unit. Mr. Shives asked Lavell Mitchell for the $80 he owed for the rental of the truck, and Lavell Mitchell said he did not have the money. In lieu of a cash payment, Lavell Mitchell gave Mr. Shives one of the nightstands and one of the dressers and "told [him] to just give [Lavell Mitchell] another hundred dollars for it." Mr. Shives said that he never made the payment because he was thereafter arrested for theft.

Mr. Shives testified that he put the furniture Lavell Mitchell had sold him in his storage unit where he also had stored some empty furniture boxes. Mr. Shives confirmed that this was the only occasion on which he rented his truck to Lavell Mitchell.

. . . .

On cross-examination by [the petitioner's] attorney, Mr. Shives stated that he was arrested because there was a question about the ownership of the furniture found in the back of his truck. Mr. Shives agreed that he had told police that he was helping someone move that day. This arrest occurred several weeks after he had retrieved his truck from Lavell Mitchell. Mr. Shives stated that he was unaware of the search warrant executed on the Whittaker Drive residence until he saw the defendants in court on these charges.

Phillip Collins testified about an interaction that occurred between the defendants in January 2011. He said he, along with others, were at the Whittaker Drive residence; however, the conversation discussing furniture occurred between only the [Defendant Mitchell, the petitioner], Ronnie Evans, and Mr. Collins. Mr. Collins said that he asked Defendant Mitchell why there was furniture in the yard and why he did not put the furniture in storage to prevent the rain from damaging the furniture. He said the men discussed Extra Space Storage, located near the Whittaker Drive residence, where Shannon Taylor, Tonio Greer, [Defendant Mitchell, and the petitioner] already rented storage units. Mr. Collins recalled that during the conversation he learned that the men wanted to "get rid of" the furniture, but no one explained why.

Mr. Collins testified that he provided police with a statement on January 20, 2011. After reviewing his statement to police, he remembered that he had stated to the police that the men wanted to get rid of the furniture "before somebody told." Mr. Collins said the concern was that someone might tell the police that the furniture was stolen he "guess[ed]." Mr. Collins stated that, during this conversation at the Whittaker Drive residence, the men discussed the fact that Defendant Mitchell and the petitioner had taken the furniture and that [Defendant Mitchell, the petitioner], Shannon Taylor, Ronnie Evans, and Lavell Mitchell were all involved in the "burglary."

Mr. Collins testified that he stole a few of the items in the yard at the Whittaker Drive residence from Defendant Mitchell. While he never discussed his taking items from the yard with Defendant Mitchell, he believed that Defendant Mitchell suspected that this had occurred. About how the furniture was moved from the Whittaker Drive residence to the storage unit, Mr. Collins stated that the defendants used a truck and trailer to

transport the items at night. He said that he observed the defendants doing so on more than one occasion.

. . . .

Henry Schoefield testified that he provided a statement to police on January 12, 2011, about the stolen furniture. Mr. Schoefield explained that [the petitioner] had approached him about buying furniture approximately one week before the police questioned him. Mr. Schoefield talked with [the petitioner] at the Dodge's Gas Station located near the Whittaker Drive residence. The two men exchanged phone numbers, and [the petitioner] called Mr. Schoefield about the furniture the following day. During the phone conversation, [the petitioner] told Mr. Schoefield that he had a "deal for [Mr. Schoefield]" and instructed Mr. Schoefield to meet him at the Whittaker Drive residence.

Mr. Schoefield testified that when he arrived at the Whittaker Drive residence, approximately forty minutes after his phone conversation with [the petitioner], both defendants were present. [The petitioner] showed Mr. Schoefield a "coffee end table set, dinette set" that was still boxed in the back yard. About buying the furniture, Mr. Schoefield told [the petitioner] that "if [he] get the money" then he would "get up with [the petitioner] later." Mr. Schoefield confirmed that he had never told [the petitioner] that he needed furniture or that he was looking to purchase furniture.

Mr. Schoefield testified that while at the Whittaker Drive residence he observed other boxes of furniture, but "a lot of the stuff was covered up . . . [with] blue plastic." Mr. Schoefield said that the bulk of the boxed furniture was outside but that there were four or five boxes inside the residence as well as unboxed items such as mirrors and decorative pieces. Mr. Schoefield also described a "mahogany wood marble top" table he observed in the house. He stated that he was interested in buying the table but that "the other two ends" were missing.

On cross-examination by Defendant Mitchell's attorney, Mr. Schoefield confirmed that he saw Defendant Mitchell at the Whittaker Drive residence, but he said that the two did not discuss the furniture. Defendant Mitchell nodded at Mr. Schoefield but "[k]ept going about his business." Mr. Schoefield confirmed that Lavell Mitchell was not present at the residence when he was looking at the furniture. When confronted with his police statement indicating that Lavell Mitchell was at the house, Mr. Schoefield

explained that, during his telephone conversation with [the petitioner], [the petitioner] indicated that Lavell Mitchell would be with him at the Whittaker Drive residence. When he arrived, however, he did not see Lavell Mitchell at the residence. He told the police Lavell Mitchell was present based upon [the petitioner's] statement during their phone conversation. Mr. Schoefield agreed that he did not know from where the furniture boxes came.

Mr. Schoefield testified that the police questioned him about the stolen furniture because [the petitioner] told the police that Mr. Schoefield bought some of the stolen furniture. Mr. Schoefield denied having bought any furniture from [the petitioner]. Mr. Schoefield agreed that he had been to the Whittaker Drive residence on a previous occasion when the boxed furniture had not been there. Mr. Schoefield acknowledged that he and [the petitioner] had a disagreement over money in May 2010. Mr. Schoefield stated that their dispute had been resolved long before he went to the Whittaker Street residence to look at the furniture.

On cross-examination by [the petitioner's] attorney, Mr. Schoefield confirmed that he did not go to the Whittaker Drive residence on the same day that he spoke with [the petitioner] at Dodge's Gas Station. After reviewing his January 12, 2011 statement, which indicated that he walked to the house with [the petitioner] after meeting him at Dodge's Gas Station, Mr. Schoefield explained that he began to walk to the Whittaker Drive residence with [the petitioner], but, upon remembering he had agreed to give someone a ride, he returned to the gas station.

. . . .

Cynthia Jones, a Memphis Police Department investigator, testified that her involvement in this case began with a telephone call from Mr. Schoefield. Sergeant Jones recalled that, during the telephone conversation, Mr. Schoefield disclosed that someone had approached him about buying furniture while he was at Dodge's Gas Station. After asking Mr. Schoefield a few questions about the location of the furniture, she asked him to come to the precinct and give a statement. Mr. Schoefield provided a statement at the precinct, and, after the information was verified, police officers executed a search warrant on the Whittaker Drive residence.

Sergeant Jones testified that, upon execution of the warrant, she observed a lot of furniture, both inside and outside of the Whittaker Drive residence. She identified the inventory list made at the scene of the numerous

items recovered. Sergeant Jones confirmed that some of the furniture was boxed while other pieces were not. Because most of the boxed items had Fox Lane Furniture store labels, the police contacted Mr. Landshof for confirmation that it belonged to him. Mr. Landshof came to the scene and identified the furniture as items stolen from his furniture warehouse. Some of the items were taken to the police property room, and the remainder Mr. Landshof and an employee loaded and transported to another location.

Sergeant Jones testified that the police took Defendant Mitchell, Lavell Mitchell, Damon Gates, Sharocka Jones, and Defendant Mitchell's two sisters into custody that night. After speaking with Defendant Mitchell's sisters, the two women were released from custody. Several days later, on January 19, 2011, police officers stopped a "white type bob truck." During the stop, the police officers learned that the tag was stolen. Sergeant Jones was later contacted about the stop due to furniture found in the back of the truck that was consistent with descriptions of the furniture taken from Mr. Landshof's furniture warehouse. Sergeant Jones said that the truck was towed and two individuals, Mr. Shives and Terrence Banks, were taken into custody that night.

Sergeant Jones testified that, the following day, January 20, 2011, she received a phone call from Phillip Collins. Mr. Collins told the sergeant that he was tired of being "the fall guy" and had heard he was being blamed for the furniture thefts. Mr. Collins provided a statement at the precinct indicating that more furniture was being stored at the Extra Space Storage facility located near the Whittaker Drive residence. Mr. Collins further provided actual storage unit numbers where the furniture was stored. Police officers obtained search warrants for these units. Upon execution of search warrants police officers recovered furniture from storage unit E22, but all of the furniture had been removed from E20 and all that remained were the Fox Lane Furniture boxes. Based upon a statement made by the manager on duty and observations made at the storage facility, officers sought and obtained another search warrant for unit number D10. The police officers found additional furniture in that unit.

Sergeant Jones testified that, at this point in the investigation, the police formally charged Mr. Shives, Defendant Mitchell, Lavell Mitchell, [the petitioner], and Ronald Evans with theft of property. Sergeant Jones interviewed Defendant Mitchell who stated that he had met a man named "Chris" at the Church's Chicken located on Elvis Presley Boulevard approximately a month or a month and a half before. He said the two men

decided to do business together, and Defendant Mitchell purchased all of the furniture recovered at the Whittaker Drive residence for $1500 from "Chris." Defendant Mitchell could not provide any additional information about "Chris" other than his first name. Defendant Mitchell stated that he purchased furniture from "Chris" on three or four occasions.

On cross-examination by Defendant Mitchell's attorney, Sergeant Jones denied that Defendant Mitchell ever told her that he bought items wholesale to resell. When asked "[w]hat was the beef" between Mr. Schoefield and [the petitioner], Sergeant Jones stated, "I wasn't aware that there was a beef." Upon further questioning, she said that Mr. Schoefield indicated to her that he did not want to be identified because of Defendant Mitchell's gang affiliation. Sergeant Jones agreed that there were "a number" of televisions in the house that Mr. Landshof did not identify as part of his missing inventory. About Mr. Collins's phone call to police about the storage unit, Sergeant Jones recalled that Mr. Collins stated that he too had rented a storage unit, but Sergeant Jones never searched the unit Mr. Collins referenced.

On cross-examination by [the petitioner's] attorney, Sergeant Jones testified that she was able to contact Mr. Landshof through information he had provided on the police reports he had filed related to the break-ins of his warehouse. At the time of Mr. Schoefield's phone call, Sergeant Jones was unaware of any burglaries involving furniture. She, however, spoke with two different supervisors, and one of them indicated that there were several reports of burglaries involving a furniture store made at the Raines Station police precinct. Sergeant Jones agreed that there were also items stolen from Fox Lane Furniture that were recovered at a flea market booth. Based on the investigation, it appeared that the flea market booth had been rented to Mr. Shives.

Sergeant Jones testified concerning Mr. Schoefield's statement at the police precinct about going to see the furniture. She said that Mr. Schoefield told her that [the petitioner] approached him at Dodge's Gas Station about furniture, and the two men walked to the Whittaker Drive residence. She said that Mr. Schoefield made no mention of exchanging phone numbers and going to the Whittaker Drive residence the following day. Sergeant Jones recalled that Defendant Mitchell, Lavell Mitchell, David Gates, Darrell Evans, Lakesha Mitchell, Tameka Odom, and Sherocka Jones were all present during the execution of the search warrant. After speaking with all of these witnesses, Sergeant Jones requested on January 14, 2011, that [the

petitioner], Phillip Collins, and Ronald Evans be located. Sergeant Jones confirmed that she learned from an Extra Space Storage manager that Seandolyn Shives never used her storage unit, E22, after she rented it but that her brother Mr. Shives used the unit. Sergeant Jones agreed that, on the day of Mr. Shives's arrest, the entry report from the storage unit showed that there were multiple entries to the property for unit E22. Sergeant Jones confirmed that E22 was the unit that had only boxes remaining when the search warrant was executed.

Defendant Mitchell testified that in 2011 he lived in a residence located on Whitaker Drive with Damon Gates and Darrell Evans. He stated that he had moved into the residence in 2009. Defendant Mitchell explained that Damon Gates was his cousin and Darrell Evans was his friend. Defendant Mitchell stated that the utilities for the residence were in the name of Sharocka Jones, the mother of two of his six children. Defendant Mitchell stated that at the time of these events he supported himself by mowing yards, selling scrap metal, selling purses and shoes, and renting his trailer. Defendant Mitchell explained that he purchased items to resell at a flea market or auction. He said that he has been buying and reselling items as a source of income for ten years.

Defendant Mitchell testified that, in November 2010, he met a man at Church's Chicken on Elvis Presley Boulevard in Memphis, Tennessee. The man pulled Defendant Mitchell aside and asked if he was interested in buying any furniture. Defendant Mitchell responded, "I'll see, you know, I'll check back with you later on." Defendant Mitchell took the man's phone number and later met the man at a flea market in Westwood. Defendant Mitchell paid $750 for "a couple of" highboys, a dresser, a nightstand, a couch, and a "couple of beds," purchased from the man's U–Haul truck. Several weeks later Defendant Mitchell called the man and arranged to buy more furniture. Defendant Mitchell explained that he was "remodeling and refurnishing" his home at the time because he had "just kind of moved."

Defendant Mitchell testified that he had never stored items at the Extra Space Storage facility nor had he ever asked someone to rent a unit for his use. He acknowledged that his father, Lavell Mitchell, had a unit at the Extra Space Storage facility but denied ever having been to the unit or knowing what items his father stored there. Defendant Mitchell recalled that his father borrowed his truck and trailer on one occasion to help his girlfriend move. Defendant Mitchell denied having "a problem" with Mr. Schoefield but

- 13 -

explained that Mr. Schoefield and [the petitioner] had an issue and that Mr. Schoefield knew the defendants to be friends.

Defendant Mitchell testified that Mr. Schoefield had been to the Whittaker Drive residence during the summer of 2010 but not since then. He denied any knowledge of Mr. Schoefield being with [the petitioner] at the residence to look at furniture. Defendant Mitchell denied any gang affiliation. Defendant Mitchell explained that there were flattened boxes that he had placed in his trailer outside the house from the furniture he had purchased for his home. Defendant Mitchell denied that there was a blue tarp covering boxes in his yard and denied that there was a great deal of furniture in his house. Defendant Mitchell described the furniture as in good shape. When asked by his attorney, "Now, [your house] has been described as overstuffed, your house was overstuffed, there's more furniture than you would need but you have been buying and selling, hadn't you?" Defendant Mitchell responded that he had sold a couple of nightstands and a bed to a friend. He said that the friend was over around Christmas to play cards and commented that she liked the furniture pieces and so Defendant Mitchell sold the items to her. Defendant denied any knowledge that the items were owned by Mr. Landshof.

Defendant Mitchell testified that he did not believe he was getting a "too good to be true deal" when he bought the furniture. He explained that he was not knowledgeable about furniture and mostly dealt with clothing, shoes, and purses. Defendant Mitchell stated that he paid the man $750.00 the first trip and $850.00 for the items he purchased during his second trip to meet with the man. When asked if he thought that the items could have been stolen, Defendant Mitchell responded, "not necessarily." Defendant Mitchell stated that his father, Lavell Mitchell, did not live with him at the time but "visit[ed] a lot." He denied ever having a conversation with Lavell Mitchell or anyone else about a burglary. He denied using his trailer to transport stolen furniture or loaning his trailer for such use.

On cross-examination, Defendant Mitchell agreed that he bought two highboys, a dresser, two nightstands, two beds, and a couch the first time he met with the man selling furniture from his U–Haul. During the second trip, he purchased a sectional couch, two more beds, "more" nightstands, a mirror, a patio set, and two armoires for $850. He added that he also purchased a drummer boy and "another kind of Christmas thing" that he was not sure "what it was." He also added that he purchased a cherry table with a marble top. Defendant Mitchell agreed that he had negotiated the price both times

- 14 -

and thought they were fair prices. Defendant Mitchell described "Chris," the man he had purchased the furniture from as six foot one or two inches tall, and brown-skinned, with a "low haircut." Defendant Mitchell stated that he met "Chris" mid-November 2010. When asked the name of the friend he sold some of the furniture to he said, "[a] girl named Teresa" and could not provide a last name. Defendant Mitchell denied that any one else had sold furniture from his house, stating that there was not any furniture at his residence to be sold. Defendant Mitchell reviewed all the photographs taken at his residence on the night of the search warrant and stated that he recognized all the pictures as photographs of his home on the night of January 12, 2011.

On redirect examination, Defendant Mitchell stated that there were items, such as wrought iron doors, clothing, MLGW meters, and pictures that were already in the house at the time he moved in.

After hearing the evidence, the jury convicted Defendant Mitchell and [the petitioner] of theft of property valued at more than $60,000. At a subsequent hearing, the trial court sentenced Defendant Mitchell to eight years, suspended to ten years of probation after service of ten months and twelve days. The trial court sentenced [the petitioner] to serve thirty years of incarceration as a career offender.

*State v. Mario Norfleet*, No. W2014-00780-CCA-R3-CD, 2015 WL 7566745, at *1-11 (Tenn. Crim. App. Nov. 23, 2015), *perm. app. denied* (Tenn. Mar. 23, 2016).

## II.     Post-Conviction Hearing

On March 20, 2017, the petitioner filed a pro se petition for post-conviction relief. After the appointment of counsel, the petitioner filed an amended petition, arguing trial counsel was ineffective for failing to adequately cross-examine the State's witnesses, failing to properly investigate the petitioner's case, and failing to properly inform the petitioner of the nature of the charges and the potential punishment the petitioner was facing. A hearing on the petition was held on November 8, 2019, and January 17, 2020.

The first witness to testify at the post-conviction hearing was the petitioner. The petitioner stated that he was incarcerated for three years in the State penitentiary in Whiteville, Tennessee, while awaiting trial in this matter. According to the petitioner, trial counsel only came to meet with him once or twice while he was in Whiteville. However, trial counsel met with the petitioner each time he was in court. During each of their meetings, they would talk about the petitioner's case. Despite these meetings, the

petitioner claimed that trial counsel never discussed trial strategy with him. The petitioner testified, "I went over and told him about the trial or what happened from A to Z, but his defense or how he's going to represent me in trial he didn't never go over it with me as far as no strategy." In addition to trial counsel visiting him in Whiteville, the petitioner testified that two investigators from trial counsel's office visited him in Whiteville to discuss his case.

The petitioner also testified that he informed trial counsel that the petitioner's brother, James Baker, was his "alibi witness." According to the petitioner, trial counsel told him that his "brother was going to testify." Mr. Baker was present at trial every day, but trial counsel never called him as a witness.

Next, the petitioner addressed his claim that trial counsel failed to adequately cross-examine Henry Schoefield. The petitioner and Mr. Schoefield were friends; however, the two had been "beefing on the streets" around the time the petitioner was arrested in the instant matter. According to the petitioner, it was because of his issue with Mr. Schoefield that Mr. Schoefield called the police and gave them the petitioner's name in connection to the thefts. The petitioner stated he informed trial counsel of his "beef" with Mr. Schoefield on "day one."

In addition to his claims that trial counsel did not meet with him enough, failed to call his brother as an alibi witness, and failed to adequately cross-examine Mr. Schoefield, the petitioner also claimed trial counsel was ineffective for failing to advise him that he would be sentenced as a career offender if convicted at trial, failed to file a written motion requesting jury instructions for certain lesser-included offenses, and failed to file a motion to suppress.

On cross-examination, the petitioner admitted he was able to tell trial counsel everything he knew "about the facts of the case and the evidence that would be useful in the case," including telling trial counsel "in detail" what he believed his trial strategy should be. The petitioner also admitted trial counsel presented proof at trial outlining the petitioner's "beef" with Mr. Schoefield.

According to the petitioner, his brother, Mr. Baker, would have been able to refute the claims made by Mr. Schoefield that the petitioner tried to sell him furniture. The petitioner stated that had Mr. Baker been called at trial he would have testified that the petitioner was with him at his apartment the entire day on the day Mr. Schoefield claimed he met with the petitioner and the petitioner tried to sell him some of the stolen furniture. The petitioner also admitted, however, that his brother was working as a truck driver during that time and was not home every day. When the petitioner asked trial counsel to call Mr. Baker, trial counsel informed the petitioner that they did not need him. The petitioner

- 16 -

testified he later learned from his mother and brother that trial counsel had told them he could not call Mr. Baker because he had been sitting in the audience each day of trial.

Trial counsel was the next witness to testify at the post-conviction hearing. Initially, trial counsel noted that he had a "very limited memory" of his representation of the petitioner as it had been eight years since the petitioner was initially indicted. Despite his limited memory, trial counsel testified as to the facts of the petitioner's case and recalled meeting and discussing the petitioner's case with him each time the petitioner was in court. During these discussions, they discussed trial strategy, including the petitioner's claim that Mr. Schoefield called the police because the two had an "ongoing beef." Unfortunately, there was not "a lot of proof of that outside of [the petitioner] saying it, . . . no crime reports, no police reports, no video, ten years ago no cellphones, you know, no video on the cell phone, kind of stuff." Therefore, the best proof trial counsel could present to the jury was either the petitioner's testimony or have Mr. Schoefield admit to it on cross-examination. Based on the lack of proof supporting the petitioner's suggested defense, trial counsel made the decision, based on his experience, to challenge the valuation of the items stolen.

Trial counsel did not recall the petitioner informing him that he had an alibi witness. However, trial counsel did note that had the petitioner informed him that his brother was his alibi witness, trial counsel would have

> explained to [the petitioner] that would have been a defense that would be absolutely unreasonable to put on, because it was so – it would have been so self-serving that no reasonable juror would believe it. And if he ran [an] alibi [defense], then we would be losing the ability to maintain the integrity with the jury and argue that either he didn't actually possess the stolen goods or he should only be held responsible for a lower amount of the theft.

Additionally, trial counsel noted that in his twenty years as a criminal defense attorney, alibi defenses "are almost 100 percent rejected by the jury."

The final witness to testify was the petitioner's brother, James Baker. When asked if he had "any information on this case," Mr. Baker stated, "[j]ust basically, they had got into it, [the petitioner] called me, I went and picked [the petitioner] up, that was over there arguing, days before all this transpired, when they got this case." Mr. Baker also testified there was one specific witness in the case that had a problem with the petitioner, but Mr. Baker did not actually name that witness. According to Mr. Baker, trial counsel told him that he would testify at trial, but on the last day of trial, trial counsel informed Mr. Baker he could not testify "because I had been in the courtroom every day."

At the conclusion of Mr. Baker's testimony and after hearing arguments from the parties, the post-conviction court took the matter under advisement. On April 24, 2020, the post-conviction court entered a written order denying the petition for post-conviction relief. This timely appeal followed.

*Analysis*

On appeal, the petitioner contends the post-conviction court erred in finding he received the effective assistance of counsel. Specifically, the petitioner argues that trial counsel was ineffective for failing to call the petitioner's brother as an alibi witness and that "trial counsel's lack of communication and [the] petitioner's lack of understanding of his case were tantamount to ineffective assistance of counsel." The State submits the petitioner failed to meet the burden required of him, and therefore, is not entitled to relief. Upon our review of the record and the applicable law, we affirm the ruling of the post-conviction court.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations de novo, affording a presumption of correctness only to the post-conviction court's findings of fact. *Id.*; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

On appeal, the petitioner contends trial counsel was ineffective "mainly due to a disagreement about the strategy for defense including the exclusion of a potential witness," James Baker. In support of his claim, the petitioner argues that Mr. Baker testified during the post-conviction hearing that the petitioner and Mr. Schoefield had been fighting and "that may have influenced his testimony at trial against [the petitioner.]" However, while such could be inferred from Mr. Baker's testimony at the post-conviction hearing, Mr. Baker did not directly name Mr. Schoefield or claim Mr. Schoefield's testimony was influenced at trial based on an argument with the petitioner. Rather, when questioned about whether he had information relevant to the petitioner's trial, the following exchange occurred:

> Counsel: If you can recall, I understand it's been some time now that's passed between this. But in this matter on [the petitioner], did you have any information on this case?
>
> Mr. Baker: I did.
>
> Counsel: Could you relay that information, Mr. Baker.

Mr. Baker:   Just basically, they had got into it, he called me, I went and picked him up, that was over there arguing, days before all of this transpired, when they got this case.

Counsel:    And specifically, one of the witnesses in this case had a problem with [the petitioner]?

Mr. Baker:   Right.

At no point during his very brief testimony did Mr. Baker name Mr. Schoefield nor did he claim Mr. Schoefield's trial testimony was influenced by an alleged argument with the petitioner. While, when viewed in light of the petitioner's testimony at the post-conviction hearing, one might infer from Mr. Baker's testimony that he was referring to Mr. Schoefield and that he believed Mr. Schoefield's testimony was influenced by this argument, such an inference is not sufficient to meet the burden required of the petitioner to prove his factual allegations by clear and convincing evidence.

Trial counsel testified that while he was aware of the petitioner's claim that Mr. Schoefield testified based on their dispute, trial counsel could not recall the petitioner ever informing him that Mr. Baker had information concerning the dispute. Furthermore, Mr. Schoefield was questioned about his dispute with the petitioner at trial. He admitted that the two had a disagreement about money but stated that the dispute had been resolved "long before" the petitioner approached him about buying furniture.

In addition to the vagueness of Mr. Baker's testimony, the petitioner's claim that Mr. Schoefield "called the police on him" and testified against him because of this dispute over money is not supported by the trial record. According to the proof presented at trial, Mr. Schoefield testified that he was only questioned by the police "about the stolen furniture because [the petitioner] told the police that Mr. Schoefield bought some of the stolen furniture." *State v. Mario Norfleet*, No. W2014-00780-CCA-R3-CD, 2015 WL 7566745, at *8.

Based on the lack of proof supporting the petitioner's allegation that Mr. Schoefield had an issue with the petitioner and testified against the petitioner based on "a beef" between the two, the petitioner has failed to establish deficient performance on the part of trial counsel. However, even if counsel should have called Mr. Baker as a witness, the petitioner cannot establish prejudice. As noted *supra*, Mr. Schoefield was questioned about his dispute with the petitioner, and contrary to the petitioner's claim, Mr. Schoefield did not turn the petitioner in to the police. Rather, Mr. Schoefield was only interviewed by the police because the petitioner told the police that Mr. Schoefield bought some of the stolen

property.  When viewed in light of the overwhelming proof of the petitioner's guilt, the petitioner has failed to prove that the outcome of his trial would have been different had Mr. Baker been called as a witness.  Thus, the petitioner failed to meet the burden required of him and is not entitled to relief.

### *Conclusion*

Based on the foregoing reasoning and authorities, we affirm the judgment of the post-conviction court.

_____
J. ROSS DYER, JUDGE